# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**SHERREL SMITH, et al.,**

              **Plaintiffs,**                              **Case No. 2:09-cv-95**
                                                            **JUDGE GREGORY L. FROST**
      **v.**                                           **Magistrate Judge E.A. Preston Deavers**

**CITY OF COLUMBUS, et al.,**

              **Defendants.**

## OPINION AND ORDER

This matter is before the Court on the following:

(1) the motion for partial summary judgment of Sherrel and De'Angelo Smith ("Plaintiffs") (Doc. # 49), the memorandum in opposition filed by Defendants the City of Columbus, the City of Columbus Division of Police, and Officer Steven Scruggs ("Police Defendants") (Doc. # 64), Plaintiffs' reply to the Police Defendants' memorandum in opposition (Doc. # 69), the memorandum in opposition of Defendants Columbus City Schools Board of Education, Vincent Clarno, Daniel A. Martin, and Milton V. Ruffin ("School Defendants") (Doc. # 66), and Plaintiffs' reply to the School Defendants' memorandum in opposition (Doc. # 71);

(2) the School Defendants' motion for summary judgment (Doc. # 50), the School Defendants' supplement to their motion[1] (Doc. # 57-1), Plaintiffs' memorandum in opposition (Doc. # 65), and the School Defendants' reply memorandum (Doc. # 70); and

(3) the Police Defendants' motion for summary judgment (Doc. # 52), Plaintiffs'

---

[1]The School Defendants filed a motion for leave to supplement their summary judgment motion (Doc. # 57), Plaintiffs indicated that they did not oppose the motion (Doc. # 59), and this Court granted the motion (Doc. # 61).

memorandum in opposition (Doc. # 63), and the Police Defendants' reply memorandum (Doc. # 68).

For the reasons that follow, the Court **DENIES** Plaintiffs' motion and **GRANTS** the School Defendants' motion and the Police Defendants' motion as they relate to Plaintiffs' federal claims.

## I.  Background

On February 6, 2008, a man was robbed near Fort Hayes Alternative High School at 7:45 a.m.  At approximately 8:37 a.m., Defendant Columbus Police Officer Steven Scruggs received a call on his police dispatch radio from Officer Twitty who advised that he was investigating the robbery.  Officer Scruggs was assigned to Fort Hayes as a school resource officer.  During the call, Officer Twitty indicated that before the robbery suspect fled in a red car he dropped a Fort Hayes High School student identification card at the scene of the robbery.  Officer Twitty stated that the student identification card belonged to "Stavante Diangelo Smith," a 5 foot 10 inch, 165 pound black male.  (Scruggs Affid. Doc. # 52-1 at ¶ 7.)  Officer Scruggs testified that he was familiar "Diangelo Smith," a 10th Grade Fort Hayes student whom he had spoken with on occasion.  *Id.* ¶¶ 9, 11.  Scruggs knew many of the Fort Hayes students because he had been assigned there as a school resource officer for several years.

The individual student with whom Officer Scruggs was familiar is Plaintiff De'Angelo Marquis Smith.  Scruggs knew him as De'Angelo Smith.  Scruggs testified that he asked Assistant Principal Dan Martin to escort De'Angelo from his study hall to Martin's office to prevent De'Angelo from overreacting at Scruggs' presence and "for everyone's safety."  *Id.* ¶ 12.  Martin went into the study hall and asked De'Angelo to accompanying him to the office.

2

Martin and De'Angelo entered Martin's office that had no lights on but had some light from an uncovered window.  De'Angelo was wearing a book bag back pack and had his back to the door through which Officer Scruggs entered.  Martin told De'Angelo to sit down at the table.

De'Angelo averred that before he could sit down at the table Officer Scruggs entered the room behind De'Angelo, pushed him in the back toward the table with his firearm pointed at De'Angelo's head, and forced him to put his face down on the desk.  In a statement made by Assistant Principal Martin, Martin wrote that Officer Scruggs entered the office with his gun drawn.  Officer Scruggs, however, testified that once De'Angelo and Martin were in Martin's office, Scruggs entered the room behind De'Angelo and told him to put his hands behind his back.  Scruggs averred that "[a]t this point, he made what to me was a sudden move with his arms, so I drew my weapon.  My finger was never on the trigger of my weapon."  (Scruggs Affid. ¶ 15.)

All parties agree that Officer Scruggs had his weapon drawn for only a few seconds, that De'Angelo did not resist Scruggs, and that once De'Angelo was bent over the table with his arms spread, Officer Scruggs holstered his weapon, handcuffed De'Angelo, patted him down for weapons, and explained that he was being held for a robbery investigation.  Scruggs then removed from De'Angelo's pockets a set of keys, an ipod, and a wallet.  Scruggs tossed De'Angelo's back pack to Assistant Principal Martin and directed him to search it.  Scruggs asked De'Angelo if he drove a red car, to which De'Angelo responded that he did but that he did not drive it that day.  Scruggs asked De'Angelo how he traveled to school that day and what class he was in first period.  De'Angelo stated that he rode the bus and was in Ms. Doddrill's class.

3

De'Angelo avers in his affidavit that he heard the dispatcher over Officer Scruggs' police radio state that the robbery suspect had dropped his wallet with an identification card in it at the crime scene.  De'Angelo testified that he twice said to Scruggs and Martin that they should look in his wallet because it contained De'Angelo's identification.  De'Angelo avers that neither individual replied or took any other action in response.  Officer Scruggs, however, stated that he asked De'Angelo for his identification and that De'Angelo said he did not have it.

Officer Scruggs left the office and asked Assistant Principal Martin to stay with De'Angelo.  Martin called Ms. Doddrill, who confirmed that De'Angelo was in her class that morning and that he was on time to the class, arriving by 7:35 a.m.  When Scruggs returned to the office Martin told Scruggs that Ms. Doddrill had confirmed De'Angelo was in her first period class.  Scruggs informed Martin that an ipod had been stolen in the robbery.

At approximately 9:10, Officer Scruggs' Sergeant came into Assistant Principal Martin's office.  De'Angelo complained that the handcuffs were too tight and Scruggs loosened them.  The Sergeant made a telephone call and left the office at approximately 9:23 a.m.  Two additional officers arrived, were introduced to Martin, spoke with Scruggs, and then left.  In Martin's statement, he wrote that at around 9:58 a.m. the two officers and the Sergeant returned.  At approximately 10:00 a.m., a young man arrived and indicated that De'Angelo was not the individual who robbed him.  The computer aided dispatch report of the incident indicates that this occurred at 9:42 a.m., fifteen minutes prior to the time Martin recalls.  After the robbery victim attested that De'Angelo was not the perpetrator of the robbery, Scruggs uncuffed De'Angelo.

One of the police officers returned to the office and, according to Martin, insisted that

4

someone had stolen De'Angelo's identification.  The officer had an Ohio identification card in his hand that had the name Stavonte D'Angelo Smith on it.  Martin looked at the card and "asked De'Angelo what was his first name.  He said De'Angelo."  (Doc. # 49 at 24.)  Martin states that he realized that the officer had an identification card that had been found at the scene of the robbery that did not belong to De'Angelo Smith.  One of the other officers had the Fort Hayes High School identification card that also had been found at the robbery scene.  Martin searched the school computer system for the individual to whom the identification cards belonged and found that there was a student at Fort Hayes named Stavonte D'Angelo Smith.  It was later determined that Stavonte D'Angelo Smith was the perpetrator of the robbery.

Assistant Principal Martin telephoned De'Angelo's mother Sherrel Smith, and Officer Scruggs spoke with her.  De'Angelo returned to his study hall class.

On February 6, 2009, De'Angelo's mother filed this action individually and as the custodial parent, guardian, and next best friend of De'Angelo, who was at that time a minor. Plaintiffs named as defendants the Police Defendants and the School Defendants.  The School Defendants originally consisted of the Columbus City Schools Board of Education, Fort Hayes Assistant Principal Martin, Fort Hayes Assistant Principal Vincent Clarno, and Fort Hayes Principal Milton V. Ruffin.  Although the School Defendants move for summary judgment on behalf of Ruffin and Clarno, Plaintiffs previously dismissed those two defendants.  (*See* Docs. # 55, 56.)

Plaintiffs allege violations of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and the analogous provisions of the Ohio Constitution.  Plaintiffs also allege common law causes of action for assault and battery, false arrest, intentional infliction of

5

emotional distress, negligent accusation of commission of a crime, defamation, loss of filial consortium, and punitive damages.

Currently before the Court are the motions for summary judgment filed by the School Defendants and the Police Defendants and the motion for partial summary judgment filed by Plaintiffs.

## II.  Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  The Court must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in favor of that party. *See id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003).  A genuine issue

6

of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie Power Prods., Inc.*, 328 F.3d at 873 (quoting *Anderson*, 477 U.S. at 248). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

### III.  Discussion

Plaintiffs alleges violations of 42 U.S.C. § 1983 ("Section 1983"), 42 U.S.C. § 1981 ("Section 1981"), and the laws of the state of Ohio.

**A.  Section 1983 - Individual Capacity Claims**

A Section 1983 plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Plaintiffs filed claims against Assistant Principal Martin and Officer Scruggs in their individual and official capacities claiming that these two defendants violated De'Angelo's constitutional rights to be free from an unreasonable search and seizure, to be free from the use of excessive force at the hands of a state actor, and to enjoy due process and equal protection under the law. Plaintiffs request summary judgment on their claims of unreasonable search and seizure and excessive force.

Martin and Scruggs, in their individual capacities, move for summary judgment on all Plaintiffs' Section 1983 claims against them based on qualified immunity. "The affirmative defense of qualified, or good faith, immunity shields 'government officials performing

7

discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Gardenhire v. Schubert*, 205 F.3d 303, 310-11 (6th Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (internal quotation marks omitted)). Where a defendant moves for summary judgment based on qualified immunity, the defendant official must first demonstrate that he acted within his discretionary authority. *Id.* at 311. Once the official makes this showing, the burden shifts to the plaintiff to establish that the defendant official's conduct violated a right so clearly established that any official in his position would have understood that he was under an affirmative duty to refrain from such conduct. *Id.* (citing Rich v. City of Mayfield Heights, 955 F.2d 1092, 1095 (6th Cir. 1992). In the present case, Plaintiffs do not dispute that these two defendants were acting within their discretionary authority–one as a school administrator and one as a police officer assigned as a school resource officer, so the burden shifts to Plaintiffs to overcome the qualified immunity defense.

The Court evaluates this burden by determining (1) whether the facts alleged or shown by Plaintiffs make out a violation of a constitutional right, and (2) whether that right was clearly established at the time of Assistant Principal Martin's and Officer Scruggs' alleged misconduct. *Saucier v. Katz*, 533 U.S. 194 (2001); *Pearson v. Callahan*, 129 S. Ct. 808 (2009).

> A right is "clearly established" for qualified immunity purposes if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202; *see also Smoak* [*v. Hall*], 460 F.3d [768,] 778 [(6th Cir. 2006)]; *Feathers* [*v. Aey*], 319 F.3d [843,] 848 [(6th Cir. 2003)]. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. If no reasonably competent officer would have taken the same action, then qualified immunity should be denied; however, "if officers of reasonable competence could disagree on [the legality of the action], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). As the Supreme Court has explained, "[t]he concern of the immunity inquiry

8

> is to acknowledge that reasonable mistakes can be made as to the legal constraints
> on particular police conduct." *Saucier*, 533 U.S. at 205. Qualified immunity leaves
> government authorities "ample room for mistaken judgments." *Scott v. Clay County*,
> 205 F.3d 867, 873 n.9 (6th Cir. 2000) (citations omitted). The doctrine protects "all
> but the plainly incompetent or those who knowingly violate the law." *Malley*, 475
> U.S. at 341.

*Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007).

Both elements of the qualified immunity test must be met for Plaintiffs to overcome the qualified immunity defense. The Court, however, may first address either of the two prongs and need not address the remaining prong if unnecessary. *See Pearson*, 129 S. Ct. at 818 ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

### 1. Search and Seizure

#### a. Officer Scruggs

The Fourth Amendment to the United States Constitution secures an individual's freedom from "unreasonable searches and seizures." *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008); U.S. Const. amend. IV. "When an officer has 'reasonable suspicion' that criminal activity may be afoot, the officer may conduct a limited seizure and briefly detain a person for investigative purposes." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 30-31 (1968)). Explaining the reasonable suspicion necessary to carry out a seizure limited to investigative purposes, *i.e.*, a *Terry* stop, the Sixth Circuit explains:

> "Reasonable suspicion" is an abstract concept:
>
> > It requires more than a mere hunch, but is satisfied by a likelihood of
> > criminal activity less than probable cause, and falls considerably
> > short of satisfying a preponderance of the evidence standard. If an

officer possesses a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts, he may conduct a *Terry* stop. Courts must examine the totality of the circumstances to determine whether reasonable suspicion existed to justify a *Terry* stop.

*Smoak*, 460 F.3d at 778-79 (quotation marks and citations omitted).

In examining the totality of the circumstances, it is important to note that the officer's reasonable suspicion need not arise exclusively from his own direct observations. Rather, it can be derived from such sources as informant tips, dispatch information, and directions from other officers. *Id.* at 779 (citing *United States v. Hensley*, 469 U.S. 221, 231-32 (1985); *Humphrey*, 482 F.3d at 848-49.

*Id.*

Officer Scruggs argues that he possessed a reasonable suspicion that the young man he knew as De'Angelo Smith had been involved in a robbery the very hour he seized him based upon the police radio dispatch to Scruggs that stated that a black male Fort Hayes High School student by the name of Stavante D'Angelo Smith had dropped his student identification at the scene of the robbery. Officer Scruggs testified that he was "100 per cent sure that [he] had the person the other officers were looking for because the name was Diangelo Smith who had a red Camero and an ipod." (Scruggs Affid. ¶ 26.) Scruggs' argument is well taken.

The names Stavante D'Angelo Smith and De'Angelo Smith are similar. The similarity is even more striking when viewed in the context of two black Fort Hayes High School students, one of whom Scruggs personally knew. De'Angelo is not a common name but instead is unique. It was entirely reasonable in this context to believe that De'Angelo was the Fort Hayes student who was wanted for a robbery that had just occurred. Moreover, it was reasonable for De'Angelo to be detained for the approximate hour it took to investigate whether he was the individual wanted for robbery. During that brief time period, it was determined that De'Angelo

10

drove a red car and he was in possession of an ipod.  The robbery suspect fled in a red car and stole an ipod.  That Scruggs' suspicion was wrong does not affect the Court's evaluation of whether it was reasonable.  *See Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 813 (6th Cir. 1999) (citing *United States v. Shareef*, 100 F.3d 1491, 1505-06 (10th Cir. 1996) (mistaken premise can justify *Terry* stop if officer acted reasonably upon it)).

Plaintiffs make much of the fact that Scruggs' recollection differs from De'Angelo's regarding whether Scruggs was told by De'Angelo that his wallet contained his Fort Hayes identification card.  Specifically, after De'Angelo was handcuffed Scruggs recalls asking De'Angelo for his identification and that he replied he did not have it.  De'Angelo recalls that he told Scruggs twice that he had his identification in his wallet and that Scruggs did not look in the wallet nor did he respond in any way to De'Angelo's statements.  Even accepting Plaintiffs' version of the facts as true, and then making the inference that Scruggs heard De'Angelo's statement about the identification card, they have no effect whatsoever on the Court's conclusion that the seizure of De'Angelo was reasonable.  The wallet did not come into play until after De'Angelo was seized.  At that time, the Court concludes that the articulable facts, *i.e.*, that De'Angelo was a black Fort Hayes student whose name was strikingly similar to that of the suspect, who at times drove a red car, and at that time had in his possession an ipod, are sufficient to constitute reasonable suspicion to continue the investigation.  This is particularly so because Scruggs knew that detainment would either be brief or turn into an arrest because the robbery victim was in route to the school to determine if De'Angelo was the perpetrator.

Moreover, this one disagreement in the factual testimony regarding the wallet does not alert this Court to the probability that Scruggs is offering his statement regarding the wallet as an

after-the-fact pretextual excuse for detaining De'Angelo, as Plaintiffs suggest.

Plaintiffs also claim that De'Angelo Smith and Stavante D'Angelo Smith were so different in size, appearance, and in the location of their homes that Scruggs should have known that he was seizing the wrong person.  Specifically, Plaintiffs argue that Stavante D'Angelo Smith's identification indicated that he was weighed 165 pounds and lived at an address that was not the same as De'Angelo's and that De'Angelo is 210 pounds and wears his hair in braids. Plaintiffs' argument is not well taken.

First, before Officer Scruggs seized De'Angleo Scruggs was only told that the police were looking for a 5 foot 10 inch black male Fort Hayes High School student by the name of Stavante D'Angelo Smith.  Consequently, the fact that Stavante D'Angelo Smith wore his hair differently than De'Angelo and lived at a different address are irrelevant to the analysis.  Second, the fact that De'Angelo and Stavante D'Angelo Smith were different weights, 210 versus 165, does nothing to change the Court's conclusion, which must be based on the totality of the circumstances.  When considering all of the other articulable facts that were before Scruggs, the difference in weight does not render Scruggs' otherwise reasonable actions unreasonable.

Further, Plaintiffs contend that "Scruggs' attempt to camouflage his pretext with a reliance on direction from police officers from the scene of the crime must fail" because the radio communication directed Officer Scruggs to detain Stavonte D'Angelo Smith and Scruggs did not follow that direction but instead "simply fabricated" his own direction and seized De'Angelo Smith.  (Doc. # 63 at 13.)  Plaintiffs rely on *Brown v. Byer*, 870 F.2d 975 (5th Cir. 1989), for support of their argument.  In *Byer*, a police officer changed the name on a warrant from Tamie Brown to Tammy Jean Brown.  The United States Court of Appeals for the Fifth

12

Circuit found that the arrest of Tammy Jean Brown violated her constitutional rights because "the alterations to the warrant supported an inference that the officer knew that the person he wanted to arrest was not the person described in the warrants.  The Court does not find *Byer* applicable in any way.  There are simply no facts before this Court to support an inference that Officer Scruggs knew that the person he seized was the wrong person.  Indeed, just the opposite.

Finally, Plaintiffs argue that Scruggs admitted that he unconstitutionally detained De'Angelo when he argued in his memorandum in opposition to Plaintiffs' motion for partial summary judgment that Scruggs, at most, was negligent in "hearing a name and believing that the name fit the suspect."  (Doc. # 64 at 3.)  Plaintiffs contend that "[b]y definition Scruggs' negligence means he acted unreasonably."  (Doc. # 69 at 3.)  This Court disagrees.

A police officer's negligence does not by definition constitute unreasonable behavior.  As this Court explained *supra*, a determination of reasonableness in the instant context requires the Court to decide whether Scruggs possessed a particularized and objective basis for suspecting De'Angelo of criminal activity based on specific and articulable facts.  *Cf. Baker v. McCollan*, 443 U.S. 137 (1979) ("we have come to the conclusion that the question whether an allegation of simple negligence is sufficient to state a cause of action under § 1983 is more elusive than it appears at first blush," and concluding that an allegedly negligent arrest based on mistaken identity could not support a Section 1983 action for deprivation of liberty).  Here, the Court determines that even if it were to conclude that Scruggs acted negligently, that conclusion is not sufficient to raise a genuine issue of material fact as to whether Scruggs violated De'Angelo's right to be free from an unreasonable search and seizure.

13

### b. Assistant Principal Martin

The United States Supreme Court has explained:

> [T]he legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search. Determining the reasonableness of any search involves a twofold inquiry: first, one must consider "whether the . . . action was justified at its inception," *Terry v. Ohio*, 392 U.S., at 20; second, one must determine whether the search as actually conducted "was reasonably related in scope to the circumstances which justified the interference in the first place," *ibid.* Under ordinary circumstances, a search of a student by a teacher or other school official will be "justified at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

*New Jersey v. T.L.O.*, 469 U.S. 325, 341-42 (1985).

In the case *sub judice*, the Court has already determined that Scruggs' search and seizure of De'Angelo was reasonable. Therefore, the Court has no difficulty determining that Assistant Principal Martin's part in the incident was also reasonable. Martin's role–escorting De'Angelo to the office and searching his book bag–did not violate De'Angelo's constitutional rights. Martin certainly had reasonable grounds for suspecting that the search would turn up evidence that De'Angelo was violating the law based simply upon the fact that it was a criminal investigation controlled by Scruggs, who directed Martin to escort De'Angelo to the office and to search De'Angelo's book bag. Further, Martin's search of De'Angelo's book bag was permissible in its scope because the measure was reasonably related to the objectives of the search and not excessively intrusive in light of De'Angelo's age and sex.

### c. conclusion search and seizure

Thus, even when viewing all of the evidence in the light most favorable to Plaintiffs and

making all reasonable inferences in their favor, the Court concludes that there are no issues of material fact as to whether Officer Scruggs or Assitant Principal Martin violated De'Angelo's constitutional right to be free from an unreasonable search and seizure.  Therefore, Scruggs and Martin are entitled to qualified immunity on this claim for relief and the Court need not address the second prong of the qualified immunity analysis, *i.e.*, whether the right at issue was clearly established.

### 2.  Excessive Force - Officer Scruggs

It is uncontroverted that the only defendant who used any force on De'Angelo was Officer Scruggs.  Plaintiffs argue that Scruggs used excessive force effectuating the seizure of De'Angelo because Scruggs entered the room with his gun drawn, pointed the gun momentarily at De'Angelo's head, and forced De'Angelo face down on a table to handcuff him.  While Scruggs argues that he did not enter the room with his gun drawn, and instead only drew it because he could not see De'Angelo's hands and he perceived him to make a sudden move, the Court must construe all of the facts in the light most favorable to De'Angelo.  *Schreiber v. Moe*, 596 F.3d 323, 332 (6th Cir. 2010) (citations omitted).  Once the Court has done so, "the question whether [Scruggs'] actions were objectively unreasonable is 'a pure question of law.' "  *Id.* (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009) and *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007)).  Thus, the Court shall accept as true De'Angelo's rendition of the facts involved in his excessive force claim.

"[C]laims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ."  *Graham v. Connor*, 490 U.S. 386, 395

15

(1989).  "In determining whether an officer's use of force was reasonable, [a court] must balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.' "  *Schreiber*, 596 F.3d at 332 (citing *Graham*, 490 U.S. at 396) (internal quotation marks omitted).  In doing so, the Court pays attention to the facts and circumstances of the particular case, including (1) the severity of the crime, (2) the immediacy of the threat posed by the suspects, and (3) whether the suspects were actively resisting or attempting to evade arrest.  *Dorsey*, 517 F.3d at 401 (citing *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 496 (6th Cir. 2007)).  " 'This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case.' "  *Id.* (citing *Smoak*, 460 F.3d at 783 (quoting *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002)).

> The United States Supreme Court explains:
>
> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  *See Terry v. Ohio*, *supra*, at 20-22. . . .  With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," *Johnson v. Glick*, 481 F. 2d, at 1033, violates the Fourth Amendment.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396-97.

In the instant action, the Court finds it helpful to address both prongs of the qualified immunity analysis in relation to Plaintiffs' excessive force claim.  Therefore, the issue before the Court is whether Officer Scruggs violated De'Angelo's clearly established Fourth Amendment rights by entering the office with his gun draw and pointing the gun at the back of De'Angelo's

head as Scruggs ordered him face down on the table.  "It is well-recognized that 'the right to
make an arrest or investigatory stop necessarily carries with it the right to use some degree of
physical coercion or threat thereof to effect it.' "  *Dorsey*, 517 F.3d at 399 (quoting *Graham*, 490
U.S. at 396).  " 'During a *Terry* stop, officers may draw their weapons or use handcuffs 'so long
as circumstances warrant that precaution.' "  *Id.* (citing *Radvansky v. City of Olmsted Falls*, 395
F.3d 291, 309 (6th Cir. 2005) (quoting *Houston v. Does*, 174 F.3d 809, 815 (6th Cir. 1999))).

     Applying these standards, although it is a very close call, the Court concludes that, when
viewing all of the evidence in the light most favorable to De'Angelo and making all reasonable
inferences in his favor, Officer Scruggs' response to the apparent demands of the situation seems
to have been exaggerated and at least arguably excessive.  That being said, Scruggs is
nonetheless entitled to qualified immunity because "officers of reasonable competence could
disagree" on the legality of Scruggs' action.  *Malley*, 475 U.S. at 341.  The Court finds the Sixth
Circuit case of *Dorsey v. Barber* instructive here.

     In *Dorsey*, Officer Begin was assigned to traffic control for the "Captain Brady Day
Parade" in the Village of Brady Lake, southeast of Cleveland, Ohio.  *Id.* at 391.  Officer Begin
received a "be on the lookout" report for two suspects in an automobile theft investigation.  The
dispatch described the suspects as two young black males, one with corn rows, one wearing a
blue jersey, and one wearing a white jersey.  Officer Begin saw two individuals who generally
matched the description of the suspects and proceeded to perform a *Terry* stop.  The *Dorsey*
court stated:

> As it turned out, plaintiffs were totally and unquestionably innocent of the charges
> under investigation.  They were released by the police approximately 54 minutes
> after they were initially stopped by Officer Begin.  In the meantime they had been
> made to lie face-down on the ground at gunpoint, were handcuffed, and were

transported in patrol cars to a police station for identification by an eye-witness.

*Id.* at 391.

The *Dorsey* court concluded:

> Plaintiffs claim that Begin used excessive force when he ordered them to the ground at gunpoint and held them there despite their unsuspicious, nonthreatening behavior. The district court held that the level of force used by Begin was at least arguably excessive.  For the reasons set forth above, we do not disagree.  *See Pray v. City of Sandusky*, 49 F.3d 1154, 1159 (6th Cir. 1995) (holding that officers' mistake in forcing innocent suspects to the floor at gunpoint could be deemed excessive).  Yet, for the reasons also set forth above, we hold that Begin is nonetheless entitled to qualified immunity on this claim, too.

*Id.* at 401-02.  The reasons "set forth above" to which the *Dorsey* court refers is its explanation that the defendant officer's arguably unreasonable actions did not preclude him from the defense of qualified immunity:

> Yet, it does not follow that Begin's mistake necessarily disqualifies him from qualified immunity.  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *Humphrey*, 482 F.3d at 847.  There is no support for the notion that Begin knowingly and deliberately violated plaintiffs' right to be free from unreasonable seizure.  Nor can his mistake be fairly characterized as so egregious as to suggest outright incompetence.  At worst, Begin made an error of judgment, erring on the side of public safety. . . .  This approach turned out to be unnecessary, but cannot be said to have been plainly incompetent or objectively unreasonable.  *See Maryland v. Wilson*, 519 U.S. 408, 414 (1997) (recognizing that risk of harm to police and others during a traffic stop is minimized if officers routinely exercise unquestioned command of the situation).

*Id.* at 400.

In the case *sub judice*, like in *Dorsey*, there is no support for the notion that Scruggs knowingly and deliberately violated De'Angelo's Fourth Amendment rights.  Nor can Scruggs' mistake as to the amount of force necessary to effectuate the seizure be fairly characterized as so egregious as to suggest outright incompetence.  At worst, Scruggs made an error of judgment, erring on the side of the safety of school students, teachers, and staff.  This approach turned out

18

to be unnecessary, but cannot be said to have been plainly incompetent or objectively unreasonable.  "Qualified immunity leaves government authorities 'ample room for mistaken judgments.' " *Humphrey*, 482 F.3d at 847 (citing *Scott*, 205 F.3d at 873 n.9).   In reaching this conclusion, the Court follows *Dorsey's* template, looking to "additional guidance in several recent Sixth Circuit rulings." *Dorsey*, 517 F.3d at 402.

In *Pray v. City of Sandusky*, 49 F.3d 1154 (6th Cir. 1995), for instance, a question of fact defeated the defendants' invocation of qualified immunity because there was evidence potentially supporting the finding that defendant officers "manhandled" the elderly plaintiffs in their home by forcing them to the floor and causing physical injuries ***after*** having become aware that they were searching the wrong residence.  *Dorsey*, 517 F.3d at 402.  Here, in contrast, neither Scruggs nor any other officer or school official involved became aware that De'Angelo was not the perpetrator of the robbery until after force was used on De'Angelo.  Moreover, it is undisputed that De'Angelo did not suffer any physical injury from the encounter.

The instant facts are also materially distinguishable from those presented in *Smoak v. Hall*, 460 F.3d 768 (6th Cir. 2006), where the defendant officers were denied qualified immunity on an excessive force claim.  The *Dorsey* court described the facts in *Smoak* as follows:

> In *Smoak*, the defendants had pulled-over a vehicle whose occupants were innocent of any wrongdoing.  In the course of the *Terry* stop, the defendants forcibly subdued one of the plaintiffs, who was handcuffed and otherwise compliant, when he jumped up in horror upon seeing an officer shoot and kill the family dog.  The defendants allegedly "knocked his legs out from under him, and threw him to the pavement face-first," causing injuries that required surgery.  460 F.3d at 783.  The court affirmed the denial of qualified immunity on the excessive force claim, holding that the alleged use of force, if proved, was not reasonable.

*Dorsey*, 517 F.3d at 402.

In contrast, in the instant action the alleged "force" implicated by the excessive force

claim against Scruggs does not even approach this level.  It was rather a show of force that did not result in any physical injury.  This Court cannot hold that no reasonable officer in Scruggs' position would have thought such actions justified under the circumstances of this case.

The facts here, like those in *Dorsey*, are more analogous to those presented in *Humphrey v. Mabry*, 482 F.3d 840 (6th Cir. 2007), where qualified immunity was granted to officers who forcibly removed the innocent plaintiff from his vehicle at gunpoint, conducted a pat-down, and partially handcuffed him.  Noting that the plaintiff was not harmed, the court held that, considering the information they relied on, the defendants could have reasonably believed that their conduct was lawful, not a use of excessive force.  Here, too, the reasonableness of Officer Scruggs' conduct must be measured in light of the limited information on which he reasonably relied.  Even if the Court were to acknowledge that the means used by Scruggs were more intrusive than necessary, a reasonable officer in his shoes could certainly believe that his actions–brandishing a firearm for a few moments and ordering a suspect (who he believed had just robbed a person) to bend over with his face on a table in a school principal's office, without firing the weapon or physically injuring the suspect in any way–were not violative of the suspect's constitutional rights.  "The contours of the right to freedom from the use of excessive force were not so clearly established in a particularized sense that a reasonable officer would have known that such conduct was unlawful."  *Id.* (citing *Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004) (making it clear that, to overcome qualified immunity, the right allegedly violated must be shown to have been clearly established in a particularized and relevant sense).

Accordingly, the Court concludes that Scruggs is entitled to qualified immunity on Plaintiffs' excessive force claim as well.

20

### 3.  Equal Protection - Officer Scruggs and Assistant Principal Martin

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  A state cannot make distinctions which either burden a fundamental right, target a suspect class, or intentionally, without a rational basis for doing so, treat one differently from others who are similarly situated.  *Vacco v. Quill*, 521 U.S. 793, 799 (1997).  The basis of any equal protection claim is that the government has treated similarly situated individuals differently.  *Silver v. Franklin Tp. Bd. of Zoning Appeals*, 966 F.2d 1031, 1036 (6th Cir. 1992).

Here, Plaintiffs make only perfunctory reference in the amended complaint to having their constitutional equal protection rights violated and do not respond in any way to the defendants' request for summary judgment on this claim.  Plaintiffs make no allegation whatsoever that any defendant acted under authority and color of state law to deprive them of their Fourteenth Amendment right to equal protection based on their ethnicity, national origin, ancestry or religion.  Indeed, Officer Scruggs and De'Angelo are both African Americans.

The Court concludes that Plaintiffs have failed set forth specific facts showing that there is a genuine issue as to whether Officer Scruggs and/or Assistant Principal Martin violated Plaintiffs' constitutional equal protection rights.   Accordingly, Scruggs and Martin are entitled to qualified immunity on that claim and the Court need not address the "clearly established" prong of the qualified immunity analysis.

### 4.  Due Process - Officer Scruggs and Assistant Principal Martin

The Fourteenth Amendment to the United States Constitution prohibits the deprivation of

21

"life, liberty, or property" without due process of law.  U.S. Const. amend. XIV.  Due process violations come in two varieties: procedural and substantive.  With regard to a procedural due process claim, a court must undertake a "two-step analysis."  *Mitchell v. Fankhauser*, 375 F.3d 477, 480 (6th Cir. 2004) (citing *Leary v. Daeschner*, 228 F.3d 729, 741-42 (6th Cir. 2000)).  First, it must determine whether the plaintiff has a property interest entitled to due process protection.  *See id.*  If he has such a protected property interest, then the Court must determine what process is due.  *See id.*

" 'The doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed has come to be known as substantive due process.' "  *Pearson v. City of Grand Blanc*, 961 F. 2d 1211, 1216 (6th Cir. 1992) (citations omitted).  "Substantive due process claims may be loosely divided into two categories: (1) deprivations of a particular constitutional guarantee; and (2) actions that 'shock the conscience.' "  *Valot v. Southeast Local Sch. Dist. Bd. of Educ.*, 107 F. 3d 1220, 1228 (6th Cir. 1997) (citations omitted).  "Where government action does not deprive a plaintiff of a particular constitutional guarantee or shock the conscience, that action survives the scythe of substantive due process so long as it is rationally related to a legitimate state interest."  *Id.*

Like their casual reference to equal protection violations, Plaintiffs make passing reference in the amended complaint to violations of their constitutional procedural and substantive due process rights and make no response at all to the defendants' arguments that Plaintiffs have failed to establish any due process violations.  And, like the Court's conclusion with regard to the statement that their equal protection rights were violated, the Court concludes that Plaintiffs failed completely to support their due process allegations.

22

With regard to procedural due process, Plaintiffs make no allegation that they have any property interest entitled to due process protection.  With regard to substantive due process, it appears that Plaintiffs may be contending that the alleged unreasonable search and seizure claim or the alleged excessive force claim violated De'Angelo's substantive due process rights.  These claims, however, are more properly analyzed under the Fourth Amendment than the substantive due process provision of the Fourteenth Amendment, "since the former is a 'more explicit textual source of constitutional protection.' "  *Wilson v. Wilkins*, 362 Fed. App'x 440, 443 (6th Cir. 2010) (quoting district court, which cited *Graham*, 490 U.S. at 395).  "Given the explicit protections afforded by the Fourth Amendment, a plaintiff cannot 'also proceed with a claim under the more generalized notion of substantive due process.' "  *Id.* (citing *Wilson v. Collins*, 517 F.3d 421, 428 (6th Cir. 2008), *Graham*, 490 U.S. at 395, and *United States v. Lanier*, 520 U.S. 259, 272 (1996) ("*Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process").

Similar to the conclusion reached with regard to Plaintiffs' claim of violations of their rights to equal protection, the Court here concludes that Plaintiffs have failed set forth specific facts showing that there is a genuine issue as to whether Officer Scruggs and/or Assistant Principal Martin violated Plaintiffs' constitutional due process rights.   Accordingly, Scruggs and Martin are entitled to qualified immunity on that claim and the Court need not address the "clearly established" prong of the qualified immunity analysis.

### 5.  Conclusion Section 1983 - Individual Capacity Claims

Based on the foregoing analysis, the Court concludes that even when viewing all of the evidence in the light most favorable to Plaintiffs and making all reasonable inferences in their favor, Officer Scruggs and Assistant Principal Martin are entitled to qualified immunity on all of Plaintiffs' Section 1983 claims filed against them in their individual capacity.  Therefore, the Court **GRANTS** the Police Defendants' and the School Defendants' motions for summary judgment on all Plaintiffs' Section 1983 claims for relief and **DENIES** Plaintiffs' motion for partial summary judgment in its entirety.

## B.  Section 1983 - Official Capacity Claims

As previously indicated, the doctrine of qualified immunity safeguards only certain natural person defendants in their individual capacities.  *Scott*, 205 F.3d at 879 (citing as an example *Painter v. Robertson*, 185 F.3d 557, 566 n.12 (6th Cir. 1999)).  By contrast, if the legal requirements of municipal or county civil rights liability are satisfied, qualified immunity will not automatically excuse a municipality or county from constitutional liability, even where the municipal or county actors were personally absolved by qualified immunity, if those agents in fact had invaded the plaintiff's constitutional rights.  *Leatherman v. Tarrant County Narcotics Unit*, 507 U.S. 163, 166-67 (1993); *Garner v. Memphis Police Dept.*, 8 F.3d 358, 365 (6th Cir. 1993).  "An official capacity claim filed against a public employee is equivalent to a lawsuit directed against the public entity which that agent represents."  *Claybrook v. Birchwell*, 199 F.3d 350, 355 n.4 (6th Cir. 2000) (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)).  Accordingly, despite the dismissal of the claims against Officer Scruggs and Assistant Principal Martin, a procedurally proper case has been stated against the City of Columbus Schools Board

24

of Education, the City of Columbus, and the City of Columbus Division of Police ("Institutional

Defendants").

      Nevertheless, if the Court had concluded that no individual defendant had deprived

De'Angelo of any constitutional right, it would have *a fortiori* defeated the procedurally proper

claim against the Institutional Defendants as well. *See City of Los Angeles v. Heller*, 475 U.S.

796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of

the individual police officer, the fact that the departmental regulations might have *authorized* the

use of unconstitutionally excessive force is quite beside the point.") (emphasis in original);

*Monday v. Oullette*, 118 F.3d 1099, 1105 (6th Cir. 1997). The Court, however, determined

*supra* that Officer Scruggs arguably used excessive force against De'Angelo. Consequently, the

Court must address Plaintiffs' claim filed against the Institutional Defendants. All parties move

for summary judgment on this claim.

      **1. City of Columbus, Division of Police**

      The Police Defendants move for summary judgment on Plaintiffs' claim against the City

of Columbus, Division of Police arguing that it is not *sui juris* and has no legal capacity to sue or

be sued. This Court agrees.

      The Sixth Circuit explained that a police department "is not a juridical entity subject to

suit under Ohio law." *Tysinger v. Police Dep't*, 463 F.3d 569, 572 (6th Cir. 2006) (citing

*Crawford v. Zeitler*, 326 F.2d 119, 121 (6th Cir. 1964), *Johari v. City of Columbus Police Dep't*,

186 F. Supp.2d 821, 825 (S.D. Ohio 2002), and *Fenstermaker v. City of Dayton,* Ohio, 712 F.

Supp. 639, 644 (S.D. Ohio 1988)). A police department is a subdivision of a municipal

corporation, the City of Columbus, which is subject to suit. *See* Ohio Rev. Code § 715.01

("Each municipal corporation is a body politic incorporated, which shall have perpetual succession, may use a common seal, sue and be sued, and acquire property . . . .").

Accordingly, the Court **GRANTS** the Police Defendants' motion for summary judgment as it relates to Plaintiffs' claims for relief filed against the City of Columbus, Division of Police.

### 2.  City of Columbus and Columbus City Schools Board of Education

With regard to the remaining Institutional Defendants, Plaintiffs assert a Section 1983 claim of municipal liability based on the Institutional Defendants' alleged policies and practices of failing to adequately train the school and police personnel "regarding the coordination of school resource officer functions and actions with school personnel functions and actions in student searches and seizures."  (Doc. # 49 at 17.)

Section 1983 does not permit a plaintiff to sue a local government entity on the theory of *respondeat superior*.  *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 692-94 (1978).  A plaintiff may only hold a local government entity liable under Section 1983 for the entity's own wrongdoing.  *Id.*  A local government entity violates Section 1983 where its official policy or custom actually serves to deprive an individual of his or her constitutional rights, *i.e.*, the policy or custom of the municipality was the "moving force" behind the deprivation of the plaintiff's rights.  *Miller v. Sanilac County*, 606 F.3d 240, 254-55 (6th Cir. 2010) (citing *Powers v. Hamilton County Pub. Defender Comm'n*, 501 F.3d 592, 606-07 (6th Cir. 2007) and *Monell*, 436 U.S. at 694).

Showings of municipal "policy or custom" vary depending upon the theory upon which a plaintiff relies.  A municipal "policy or custom" may be shown by the plaintiff pointing to a duly adopted municipal law, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986), or to a

statement by a policymaking official, *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 737 (1989), or to a custom so widespread and well-settled "as to have the force of law," *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997), or to inadequate screening, training or supervision by the municipality of its employees, *Bd. of the County Commr's v. Brown*, 520 U.S. 397 (1997) (screening) and *City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (training and supervision).  In the instant action, Plaintiffs rely on the liability through inaction theory claiming that the Institutional Defendants failed to adequately train Assistant Principal Martin and Officer Scruggs.  *See City of Canton*, 489 U.S. at 390.

"The inadequacy of police training only serves as a basis for § 1983 liability 'where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.' "  *Slusher v. Carson*, 540 F.3d 449, 457 (6th Cir. 2008) (quoting *City of Canton*, 489 U.S. at 388).

> [The Sixth Circuit] has identified two situations justifying a conclusion of deliberate indifference in claims of failure to train or supervise.  "One is failure to provide adequate training in light of foreseeable consequences that could result from a lack of instruction."  *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999).  In *City of Canton*, for example, the Supreme Court indicated that a city could be deliberately indifferent by failing to train its police officers in the use of deadly force because it is obvious that the officers will need to use such force when they are armed with guns and required to arrest fleeing felons. 489 U.S. at 390 n.10. . . ."  A second type of . . . deliberate indifference is where the city fails to act in response to repeated complaints of constitutional violations by its officers."  *Brown*, 172 F.3d at 931.

*Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700-01 (6th Cir. 2006).

Here, Plaintiffs rely on the first situation that justifies a conclusion of deliberate indifference, claiming that the Institutional Defendants failed to provide adequate training in light of foreseeable consequences that could result from a lack of instruction.  The evidence offered by Plaintiffs, however, does not show that the Institutional Defendants failed to

27

adequately train Scruggs and/or Martin regarding the law of the use of force (or in the law of search and seizure for that matter).

The evidence upon which Plaintiffs rely are the Institutional Defendants' responses in discovery indicating that they do not have specific training classes for the "coordination of school resource officer functions and actions with school personnel functions and actions in student searches and seizures." (Doc. # 49 at 17.) Simply because the Institutional Defendants do offer these types of "coordination" classes does not necessarily mean that they were deliberately indifferent to training Officer Scruggs and Assistant Principal Martin in law of the use of force (or search and seizure). Moreover it certainly is not sufficient to show that the failure to offer this type of training was the "moving force" behind the deprivation of De'Angelo's rights. *Sanilac County*, 606 F.3d at 254-55; *Monell*, 436 U.S. at 694. While this type of "coordination" training may be helpful in addition to the training that the Institutional Defendants provide, their failure to provide this type of training falls far short of deliberate indifference.

Indeed, the evidence shows that both Scruggs and Martin had regular training on the type of situation at issue here. Officer Scruggs was initially trained in 1985 at the Columbus Police Academy. Since that time, he has received consistent training on various police subjects, including search and seizure and excessive force as these topics relate to adults and juveniles. Columbus Assistant City Attorney Jeffrey S. Furbee testified that he provides much of the training to the Columbus Police Officers regarding search and seizures. He avers that the Columbus Police Officers receive ongoing training regarding the law of search and seizure through written materials provided to them on a monthly basis and in person training during roll

calls.  Further, all Columbus Police Officers are required to attend yearly in-service legal update training, which is conducted by the Columbus City Attorney's Office.  A "large part" of that training relates to the laws of search and seizure.  (Doc. # 52-3.)  Officer Scruggs was subjected to all of this training and was also evaluated by his superiors on a regular basis.  For the five years proceeding the instant incident, Scruggs received no complaints of excessive force or any other misconduct.

With regard to Assistant Principal Martin, the Columbus Public Schools Board of Education has a distinct policy, which was memorialized by agreement between the Columbus Public Schools and the Columbus Police Department, that requires school official to abide by the orders of the police officer in charge of any criminal situation that takes place on school grounds. The agreement is four pages long and "defines the guidelines and tasks regarding the utilization of School Resource Officers in the Columbus City Schools."  (Doc. # 50-2.)  The agreement sets forth guidelines related to, *inter alia*: the philosophy, goals, and general policies of the school resource officer program; what to do in the event of violations of school rules, student conduct rules, and laws; chain of command in the event of criminal situations and investigations; and support for the resource officer from the Columbus City Schools Director of Safety and Security. *See id.*  There is no dispute that Martin was aware of this agreement, and indeed acted in accordance with it.  That is, Martin was not involved in any use of force against De'Angelo and instead allowed Officer Scruggs to control the situation.

The Court concludes that, lacking a showing of the "obvious" need for more or different training than Officer Scruggs and Assistant Principal Martin already received, Plaintiffs' arguments fail.  *See Plinton v. County of Summit*, 540 F.3d 459 , 465 (6th Cir. 2008) ("deliberate

indifference is a 'stringent standard of fault,' . . . [therefore] [l]acking a showing of the 'obvious' need for more or different training than Lavery already received as an experienced police officer and as part of the [Summit County Drug Unit], Plaintiff's arguments fail.").

Therefore, the Court **GRANTS** the Police Defendants' motion for summary judgment and the School Defendants' motion for summary judgment as it relates to Plaintiffs' failure to train claims.

## C. Section 1981

Plaintiffs make passing reference to Section 1981 in the amended complaint and then offer no allegations in support of that claim. Plaintiffs have not made any allegation that De'Angelo was deprived of the "full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white persons" and not subjected "to like punishment, pains, penalties, taxes, licenses and exactions of every kind." 42 U.S.C. § 1981. From the face of the complaint, and from Plaintiffs' briefing before this Court, differentiation based on race is simply not an issue. Nowhere do Plaintiffs claim that they were treated differently in any way based upon their race. A Section 1981 claim cannot survive on bare allegations of a denial of equal protection.

Consequently, the Court **GRANTS** the Police Defendants' motion for summary judgment and the School Defendants' motion for summary judgment as it relates to Plaintiffs' Section 1981 claim.

## D. State Law Causes of Action

Because the Court disposes of all of Plaintiffs' federal claims by this Opinion and Order, the Court declines to exercise supplemental jurisdiction over their state law claims pursuant to

30

28 U.S.C. § 1367(c)(3).  Consequently, the Court **DISMISSES** Plaintiffs' state law claims without prejudice.  *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966) ("If the federal claims are dismissed before trial . . . the state claims should be dismissed as well."); *see Brandenburg v. Housing Auth. of Irvine*, 253 F.3d 891, 900 (6th Cir. 2001) ("the usual course is for the district court to dismiss the state-law claims without prejudice if all federal claims are disposed of on summary judgment").

### IV.  Conclusion

For the reasons set forth above, the Court **DENIES** Plaintiffs' motion for partial summary judgment (Doc. # 49) and **GRANTS** the School Defendants' motion for summary judgment (Doc. # 50) and the Police Defendants' motion for summary judgment (Doc. # 52) as they relate to Plaintiffs' federal claims.  The Court declines to exercise jurisdiction over Plaintiffs' state law claims and therefore **DISMISSES** them without prejudice.  The Clerk is **DIRECTED** to **ENTER JUDGMENT** in accordance with this Opinion and Order.

**IT IS SO ORDERED.**

**/s/ Gregory L. Frost**
**GREGORY L. FROST**
**UNITED STATES DISTRICT COURT**